## IN THE COURT OF COMMON PLEAS, LICKING COUNTY, OHIO

| | | |
|---|---|---|
| DUTCHMAID LOGISTICS, INC., | : | |
| PCM TRANSPORT, LLC and | : | |
| MARK R. LEWIS, LLC d/b/a | : | |
| MARK LEWIS TRUCKING | : | **CASE NO. 15 CV 00129** |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | **JUDGE BRANSTOOL** |
| NAVISTAR, INC.,   AND | : | |
| TRUCK SALES & SERVICE, INC. | : | |
| Defendants. | : | |

### FIRST AMENDED COMPLAINT WITH JURY DEMAND

NOW COME, Dutchmaid, Logistics, Inc., PCM Transport, LLC, and Mark R. Lewis, LLC (hereinafter collectively referred to as "Plaintiffs") and complain of Navistar, Inc. (hereinafter referred to as "Navistar"), and Truck Sales & Service, Inc. (hereinafter referred to as "Truck Sales" and collectively, "Defendants"), and for cause of action would respectfully show unto the Court as follows:

### I.

### PARTIES AND JURISDICTION

1.      Plaintiff Dutchmaid Logistics, Inc. ("Dutchmaid") is a domestic corporation incorporated under the laws of Ohio with its principal offices located in Willard, Huron County, Ohio.

2.      Plaintiff PCM Transport, LLC, ("PCM") is a limited liability company incorporated under the laws of Ohio with its principal offices located in Coshocton, Coshocton County, Ohio.

3.      Plaintiff Mark R. Lewis, LLC d/b/a Mark Lewis Trucking ("Mark Lewis"), is a limited liability company incorporated under the laws of Ohio with its principal offices located in Hopedale, Harrison County, Ohio.

1

**EXHIBIT B**

4.      Defendant Navistar is incorporated under the laws of Delaware, with its principal office in Lisle, Illinois. Defendant Navistar does business in the State of Ohio and may be served with process by serving its registered agent may be served with process by serving its registered agent CT Corporation, 1300 E. 9th St., Cleveland, Ohio 44114.

5.      Defendant Truck Sales & Service, Inc., is a registered Ohio company, with its principal office located in Midvale, Tuscarawas County, Ohio and may be served with process by serving its registered agent, Rodney Rafael, 3429 Brightwood Rd., Midvale, Ohio 44653.

6.      Venue is proper in Licking County, Ohio because it is the county in which the cause of actions in this case accrued.

## II.

## FACTUAL BACKGROUND

7.      Plaintiff Dutchmaid is a logistics company and owner of a commercial trucking fleet and is engaged in the business of hauling dry and refrigerated commodities across 48 states.

8.      Plaintiff PCM is a logistics company and owner of a commercial trucking fleet and is engaged in the business of hauling general freight across 48 states.

9.      Plaintiff Mark Lewis is a logistics company and owner of a commercial trucking fleet and is engaged in the business of hauling general freight across 48 states.

10.     Navistar is a Delaware corporation that manufactures Trucks and other equipment.

11.     Navistar manufactures International brand ("International") heavy-duty commercial Trucks and MaxxForce brand ("MaxxForce") diesel engines.

12.    Truck Sales is an Ohio company that sells and services Navistar Trucks and equipment including International Trucks and MaxxForce diesel engines.

**Defendants' Authorized Dealer Distribution Network**

13.    Navistar provides a package of goods and services to buyers of International Trucks with MaxxForce engines by distributing their products through a nationwide network of authorized dealers (the "Navistar Network").

14.    Authorized dealers in the Navistar Network – such as Truck Sales - act as agents for Defendant in connection with the purchase and service of International Trucks with MaxxForce engines.

15.    Upon information and belief, dealers in the Navistar Network rely almost exclusively on materials and training received from Defendants when making representations about International Trucks and MaxxForce engines to their customers.

16.    Defendants regularly provide authorized dealers with International and MaxxForce branded literature, signage, and training materials for use in promoting, selling and financing the purchase of their Trucks to customers.

17.    In addition, Defendants routinely hold training seminars for authorized dealers in the Navistar Network.

18.    During these seminars, Defendants coach dealers in the Navistar Network and their sales staff on the best ways to sell International Trucks to customers, including providing detailed comparisons of competing manufacturers' products and outlining the specific information dealers should emphasize when pursuing a sale.

19.    In areas where they lack knowledge, dealers in the Navistar Network are encouraged to visit Navistar's website for additional information.

20.     Potential Navistar customers are also encouraged to visit Navistar's website when seeking information about International Trucks and the MaxxForce engine.

21.     Navistar's website contains informational materials and statements to aid dealers and induce the customer to purchase Defendants' products.

22.     In addition, Navistar furnishes the actual specifications of each Trucks including fuel efficiency information, rather than relying on the dealers to generate those details for customers interested in purchasing International Trucks.

23.     Upon information and belief, Defendants intend for dealers in the Navistar Network to rely almost exclusively on information provided by Defendants when making representations to potential customers and inducing customers to purchase International Trucks with MaxxForce engines.

24.     Between 2011 and 2012, Plaintiff Dutchmaid Logistics, Inc. purchased twenty (20) International ProStar on-highway semi-Trucks, from Defendant Navistar and Defendant Truck Sales at Truck Sales' dealership in Mansfield, Richland County, Ohio.

25.     In 2011, Plaintiff PCM, LLC, purchased two (2) International ProStar on-highway semi-Trucks, from Defendant Navistar at its retail location in Etna, Licking County, Ohio.

26.     In 2011, Plaintiff MARK R. LEWIS, LLC, purchased five (5) International ProStar on-highway semi-Trucks, from Defendant Navistar and non-party Hill International Trucks in East Liverpool, Columbiana County, Ohio.

27.     At the time of purchase, the subject semi-Trucks were warranted by Defendant Navistar, both expressly in writing, and orally by Defendants' agents and representatives, to be free from defects in material and workmanship.  At the time of

4

purchase, Navistar's agents and representatives assured Plaintiffs that the Trucks were in perfect working order and without defects.

28.     However not long after the purchase of the Trucks, Plaintiffs began to experience numerous breakdowns of its Trucks, specifically the EGR system, EGR coolers, EGR valves, and other components of the Trucks and engines. Defendant Truck Sales was an agent for Navistar and assisted in the repairs of the Trucks.

29.     Subsequently, Plaintiffs' Trucks went into service shops, including Defendant Truck Sales, to repair problems directly related to these systems and components.

30.     Despite numerous attempts to correct the Trucks' problems by Defendants Navistar and Truck Sales, Defendants have failed to adequately correct the problems.

31.     Plaintiffs were led to believe that each repair or remedy would solve the defect; however Plaintiffs' Trucks continued to be defective.

**Defendants' Representations**

32.     Defendants, through their agent, Truck Sales, repeatedly made representations concerning their unique exhaust gas recirculation ("EGR") emission system on the MaxxForce 13-litre engine.

33.     According to representations made to Plaintiffs, Defendants' proprietary EGR system was purportedly certified under the Environmental Protection Agency's ("EPA") 2007 emissions standards for use on heavy-duty commercial Trucks.

34.     Based on their public statements and press releases, it appeared that Defendants were attempting to distinguish themselves from competitors by becoming the only heavy-duty Trucks manufacturer in North America to rely entirely on EGR to meet the EPA emissions standards.

35. Defendants' EGR system recirculates the exhaust gas produced by the engine back into the engine to be re-combusted.

36. Other heavy-duty commercial Trucks manufacturers in North America use a combination of EGR and selective catalytic reduction ("SCR"), which requires injecting a chemical after-treatment—a urea based compound known as DEF—into the exhaust gas once it leaves the engine, thereby neutralizing and/or reducing harmful emissions.

37. Defendants were the only manufacturer of heavy-duty commercial Trucks in North America that relied entirely on EGR to meet EPA emissions standards.

38. According to representations made by Defendants, the EGR system purportedly provides better "fluid economy" than other brands' combination SCR systems because EGR does not require the use of an after-treatment to neutralize harmful emissions—an additional operating cost that each fleet owner or Truck driver would have to bear.

39. As a result, Defendants represented that the MaxxForce powered ProStars deliver the "lowest cost of ownership in the industry."

40. Defendant Navistar also represented that its engines had met the EPA 2010 emissions standards of 0.2g NOx and were the only heavy duty engine manufacture able to do so inside the cylinder.

41. However, based upon information and belief, Defendant Navistar engines never reached the EPA 2010 emissions 0.2g NOx standards threshold and Defendant Navistar knew that the engines were never going to this requirement using EGR only technology.

42. Additionally, as discussed below, the Trucks' EGR system was flawed and became one of the most significant and consistent problems with the Trucks.

43.    Throughout the course of negotiations, Defendants made several other representations to Plaintiffs through its agents Truck Sales and non-party Hill International that proved to be untrue.

44.    Defendants and their agents assured Plaintiffs that the Trucks were free from defects and suitable to perform the duties for which they were manufactured.

45.    However, if Plaintiffs did experience problems with the Trucks' operation, Defendants and their agents assured Plaintiffs that the expansive Navistar Network would make its certified technicians and quality parts available if repairs were necessary.

46.    Defendants and their agents further represented to Plaintiffs that all authorized dealers in the Navistar Network have MaxxForce ProStar certified technicians on staff and available at all times.

47.    Defendants and their agents also touted their optional "OnCommand" service, which was purported to reduce downtime by communicating with repair departments in the Navistar Network to schedule parts deliveries, alert technicians, and provide troubleshooting support, all before a disabled Trucks is delivered for repairs.

48.    Defendants and their agents represented to Plaintiff that MaxxForce powered ProStars are designed and built to maximize uptime, minimize downtime, and be "always performing."

49.    Defendants and their agents represented that MaxxForce powered ProStars had millions of miles of actual road testing and years of simulated testing to provide road-ready Trucks from the day of purchase.

50.    Defendant Truck Sales and non-party Hill International, acting as Defendants' agents, relayed much of the above-described representations directly to Plaintiffs.

51. Upon information and belief, Plaintiffs assert that Defendant Navistar made the above representations either directly or through Defendant Truck Sales and non-party Hill International, with the intention of inducing Plaintiffs to purchase the Trucks.

52. According to their public filings, Defendants spend close to $30 million per year on advertising intended to reach customers and induce them to purchase Defendants' products.

53. Persuaded by Defendants' and their agents' representations regarding the quality and capabilities of the Trucks and the attendant support of the Navistar Network, Plaintiffs purchased the Trucks from 2011 to 2012.

54. Upon information and belief, one of the most significant problems with Defendant's EGR system is that the continuous recirculation of exhaust gas back into the engine reduces the engine's efficiency, causes it to overheat, and produces excessive soot inside the engine.

55. Plaintiffs were repeatedly forced to take the Trucks in to the Navistar Network for repairs due to indications that the engine was overheating.

56. Over the three (3) years that Plaintiffs owned the Trucks, the Trucks were in the shop for warrantied repairs on more than one- hundred (100) separate occasions, not including other routine maintenance required for commercial heavy-duty Trucks.

57. The problems Plaintiffs experienced with the Trucks that required taking the Trucks into the Navistar Network for repairs included, but are not limited to:

    a.    Repeated instances of check engine lights illuminating;

    b.    Engine derating;

    c.    EGR system failure, including but not limited to:

        i. EGR sensor failure;

8

        ii. full replacement of the EGR valve and cooler system;

        iii. cooling system failures causing the engine to overheat; and

        iv. other problems or failures specifically related to the EGR

system;

d.     Hoses and connections becoming clogged or prematurely worn;

e.     Other issues that prevented the Trucks from functioning as warranted.

58.     To compound the problem, Plaintiffs were repeatedly delayed in getting the Trucks back into operation after they had been in the shop for maintenance and/or repairs, by Defendants' inability or unwillingness to promptly provide certified technicians and necessary parts at service locations in the Navistar Network.

59.     Based upon information and belief, on many occasions the parts needed to complete the repairs to Plaintiffs' Trucks were on national back order and/or unavailable which contributed to the substantial delays in the repairs.

60.     In fact, on several occasions Plaintiffs were forced to wait days for necessary repairs.

**Defendants' Knowledge of Problems with MaxxForce ProStars and MaxxForce 13-litre engines**

61.     Upon information and belief, prior to Plaintiffs' purchase of the Trucks, Defendants became aware that the MaxxForce powered ProStar truck line was woefully inadequate for public distribution.

62.     According to industry standards, heavy-duty commercial Trucks engines are extensively tested for years before public distribution.

63.     Manufacturers of heavy-duty commercial truck engines run the engines in controlled conditions for thousands of hours in order to simulate actual driving conditions.

64. As a result of this extensive testing, manufacturers obtain large amounts of data regarding problems associated with the engine performance.

65. Upon information and belief, Defendants were able to accurately predict the exact types of problems that would occur with MaxxForce engines.

66. Upon information and belief, Defendants knew that the MaxxForce engines had significant and documented problems and concealed this information from the public and Plaintiffs.

67. Upon information and belief, Defendant Navistar knew that the MaxxForce engines never met the 0.2g NOx threshold and never would and concealed this information from the public and Plaintiffs.

68. Upon information and belief, Defendant Navistar knew as early as 2010 that its EGR-only technology was "still maturing" and concealed this information from the public and Plaintiffs.

69. Upon information and belief, Defendant Navistar knew that by mid-2011 the MaxxForce engines were experiencing significant warranty claims increases and concealed this information from the public and Plaintiffs.

70. Upon information and belief, Defendant Navistar knew that it was only able to sell MaxxForce engines using "banked" emissions credits and concealed this information from the public and Plaintiffs.

71. However, in February 2012, Defendant Navistar ran out of "banked" emissions credits and was notified by the EPA that it would be fined as much as $37,500 per violation, or up to $285 million, for shipping thousands of back-dated engines during the 2010 engine transition.

72.     Nevertheless, upon information and belief, Defendants proceeded to manufacture and distribute the MaxxForce powered ProStars while continuing to make false representations to the public and to Plaintiff regarding the performance capabilities, reliability, EPA certification, and Defendant Navistar's commitment to the MaxxForce engine that Defendant knew to be false.

73.     Finally, in July of 2012, Defendant's made a public announcement that they were no longer going to produce 11-liter and 13-liter engines with EGR-only systems, but rather they would be switching to combination SCR systems. Defendants also announced that they were ceasing production entirely on their EGR- only 15-liter engine.

74.     As a result of the above-described acts and/or omissions, Plaintiffs were forced to institute this legal proceeding to recover for their injuries resulting from Defendants' breach of warranty, breach of contract, fraud, and conspiracy in connection with the purchase of the Trucks.

75.     As a direct and proximate result of Defendants' above-described conduct, Plaintiffs suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

   a.     Loss of profits;

   b.     Downtime expenses and losses;

   c.     Diminished resale value on the Trucks;

   d.     Out-of-pocket repair expenses;

   e.     Fuel expenses incurred in excess of the represented amounts;

   f.     Towing expenses;

   g.     Lodging expenses for Plaintiff drivers;

   h.     Rental car expenses, including fuel for same;

i.      Unreimbursed driver downtime;

j.      Loss of revenue; and

k.      Other economic, financial, consequential and incidental damages allowed by law or equity.

### III.

### CAUSES OF ACTION

76.     Plaintiffs incorporate the factual allegations described above by reference for the causes of action below.

### BREACH OF EXPRESS WARRANTY

77.     Plaintiffs bring a cause of action for breach of an express warranty against Defendant Navistar for representing to Plaintiffs that the Trucks were of a particular quality when, in fact, they were not.

78.     Defendant produced and manufactured the Trucks, which were ultimately sold to Plaintiffs.

79.     During the negotiations leading up to purchasing the Trucks, Navistar made the above described representations through its agent, Defendant Truck Sales and non-party Hill International to Plaintiffs.

80.     Navistar expressly assured Plaintiffs that the Trucks were free from defects and was suitable to perform the duties for which they were manufactured and sold. Copies of the complete written express warranties given to Plaintiffs cannot be located and therefore they are not attached to this Complaint. However, Defendants are in possession of the documents.

81.     Navistar expressly assured Plaintiffs they had an extensive network of service centers that would promptly provide parts and trained technicians needed to fix any problems experienced by Plaintiffs with the Trucks.

82.     Plaintiffs relied on the above-described representations from Defendants and non-party Hill International in making its decision to purchase the Trucks.

83.     Plaintiffs repeatedly notified Navistar and its agents, including Defendant Truck Sales, of the defects related to the Trucks and their MaxxForce engines, but Defendants failed and/or refused to make repairs sufficient to correct the defects.

84.     Truck Sales expressly assured the repairs that it performed to the Trucks would remedy the Known Defects in the Trucks; however the repairs did not remedy the Known Defects.

85.     As a proximate result of Defendants' breach of express warranty, Plaintiffs have suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

     a.     Loss of profits;

     b.     Downtime expenses and losses;

     c.     Diminished resale value on the Trucks;

     d.     Out-of-pocket repair expenses;

     e.     Fuel expenses incurred in excess of the represented amounts;

     f.     Towing expenses;

     g.     Lodging expenses;

     h.     Rental car expenses, including fuel for same;

     i.     Unreimbursed driver downtime;

     j.     Loss of revenue; and

k.      Other economic, financial, consequential and incidental damages allowed by law or equity.

### BREACH OF IMPLIED WARRANTY

86.      In addition, or in the alternative, Plaintiffs bring a cause of action for breach of an implied warranty against Defendant Navistar for representing to Plaintiffs that the Trucks were of a particular quality when, in fact, they were not.

87.      Defendant Navistar produced and manufactured the Trucks, which were ultimately sold to Plaintiffs.

88.      During the negotiations leading up to purchasing the Trucks, Defendant through its agents, Defendant Truck Sales and non-party Hill International, made the above described representations to Plaintiffs.

89.      Defendants impliedly assured Plaintiffs that the Trucks were free from defects and was suitable to perform the duties for which they were manufactured and sold.

90.      Further, Defendant impliedly assured Plaintiffs that the Trucks were merchantable.

91.      Plaintiffs ultimately discovered that the Trucks were not merchantable and had significant problems, as discussed above, and including, but not limited to:

a.      Repeated instances of check engine lights illuminating;

b.      Engine derating;

c.      EGR system failing, including but not limited to:

i.      EGR sensor failure;

ii.     Full replacement of the EGR valve and cooler system;

iii.    Cooling system failures causing the engine to overheat; and

14

        iv.     Other issues specifically related to the EGR system;

    d.     Hoses and connections becoming clogged or prematurely worn;

    e.     Reduced fuel efficiency; and

    f.     Other issues that prevented the Trucks from functioning as warranted.

92.     Plaintiffs relied on the above-described representations from Defendants in making their decision to purchase the Trucks.

93.     Plaintiffs repeatedly notified Defendants of the defects related to the Trucks and their MaxxForce engines, but Defendants failed and/or refused to make repairs sufficient to correct the defects.

94.     Defendant Truck Sales impliedly assured the repairs that it performed to the Trucks would remedy the Known Defects in the Trucks; however the repairs did not remedy the Known Defects.

95.     As a proximate result of Defendants' breach of implied warranty, Plaintiffs have suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

    a.     Loss of profits;

    b.     Downtime expenses and losses;

    c.     Diminished resale value on the Trucks;

    d.     Out-of-pocket repair expenses;

    e.     Fuel expenses incurred in excess of the represented amounts;

    f.     Towing expenses;

    g.     Lodging expenses;

     h.     Rental car expenses, including fuel for same;

     i.     Unreimbursed driver downtime;

     j.     Loss of revenue; and

     k.     Other economic, financial, consequential and incidental damages allowed by law or equity.

## BREACH OF CONTRACT

96.     In addition, or in the alternative, Plaintiffs bring a cause of action for breach of contract against Defendants in that Defendants failed to provide Trucks free from defects in accordance with the terms of the agreement.

97.     Plaintiffs entered into a valid, enforceable contracts with Defendants.

98.     The aforementioned contracts obligated Plaintiffs to buy and Defendants to provide the Trucks free from defects (the "Agreement"). The Agreements are attached hereto as Exhibit "A".

99.     Plaintiffs performed their contractual obligations by purchasing the Trucks.

100.     Defendants breached the Agreement by failing to provide Trucks that were free from defects in accordance with the terms of the Agreement.

101.     As a proximate result of Defendant's breach of the Agreement, Plaintiffs have suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

     a.     Loss of profits;

     b.     Downtime expenses and losses;

     c.     Diminished resale value on the Trucks;

     d.     Out-of-pocket repair expenses;

     e.     Fuel expenses incurred in excess of the represented amounts;

f.     Towing expenses;

g.     Lodging expenses;

h.     Rental car expenses, including fuel for same;

i.     Unreimbursed driver downtime;

j.     Loss of revenue; and

k.     Other economic, financial, consequential and incidental damages allowed by law or equity.

## FRAUD

102.    In addition, or in the alternative, Plaintiffs bring a cause of action for fraud against Defendant Navistar for knowingly making false representations of material fact to Plaintiffs in connection with the purchase of the Trucks.

103.    Upon information and belief, Defendant Navistar's agents provided Plaintiffs with false information regarding the Trucks, including by not limited to the Trucks' performance capabilities, fuel economy, the effectiveness and durability of the Trucks' EGR system, the Trucks' overall fitness for use, and 2010 EPA emissions certification (the "Misrepresentations").

104.    Defendant Navistar's Misrepresentations included the following material representations to Plaintiffs, upon which Plaintiffs relied in connection with the purchase of the Trucks:

a.     The MaxxForce EGR system provides better "fluid economy" than other brands' selective catalytic reduction (SCR) system;

b.     MaxxForce powered ProStars deliver the "lowest cost of ownership in the industry";

c.      The Trucks were free from defects and was suitable to perform the duties for which they were manufactured and sold;

d.      Defendants offer an expansive network of MaxxForce ProStar certified technicians and quality parts that would be available to make repairs;

e.      All authorized dealers in Defendants' network have MaxxForce ProStar certified technicians on staff at all times;

f.      Defendants' OnCommand service reduces downtime by communicating with the dealer's repair department and scheduling parts, technicians, and suggested troubleshooting all before the Trucks even arrives at the mechanic's shop;

g.      MaxxForce powered ProStars are built for performance, reliability, and durability;

h.      MaxxForce powered ProStars are built to maximize uptime, minimize downtime and be "always performing";

i.      MaxxForce powered ProStars have millions of miles of actual road testing and years of simulated testing to provide road ready Trucks from the day of purchase;

j.      The MaxxForce engines were EPA 2010 certified;

k.      The MaxxForce engines met the 0.2g NOx emissions threshold in cylinder; and

l.      The MaxxForce engines provided better fuel economy that its competitors;

105. Upon information and belief, Defendant Navistar knew that the Misrepresentations were false when they were made.

106. Upon information and belief, the Misrepresentations were made by Defendant Navistar to their agents including, Defendant Truck Sales and non-party Hill International, with the intent that Truck Sales would pass along the Misrepresentations to potential buyers, including the Plaintiffs.

107. Defendant Truck Sales and non-party Hill International did, in fact, make the Misrepresentations to Plaintiffs regarding the Trucks.

108. Specifically, Plaintiff Dutchmaid's Vice President of Operations, Sam Burrer heard the aforementioned representations during conversations with Navistar representatives Herb Cooper, John Lasson, and Brian Pasko and with Defendant Truck Sales representative, Ron Didion, and Gerry Billinghurst, during the months leading up to the purchase of the Trucks in 2011 and 2012. These conversations occurred at various times through email and telephone in the early March 2011 – July 2011 time period and also at various places including at a visit that Mr. Burrer had to Navistar's Huntsville engine plant in January 2012. Additionally, Mr. Burrer reviewed trade publications between 2010 and 2012 which contained the aforementioned Misrepresentations regarding the MaxxForce Trucks and engines. Navistar encouraged Plaintiff to review available trade publications in which Navistar promoted the MaxxForce line. Defendant Navistar's Misrepresentations included the following material representations to Plaintiffs, upon which Plaintiffs relied in connection with the purchase of the Trucks:

109. Specifically, Plaintiff PCM heard the aforementioned representations during conversations with Navistar representatives at Navistar's Etna, Ohio, sales facility during the months leading up to the purchase of the Trucks in 2011. Specifically, Plaintiff PCM's

representative, Clifford Mathias, spoke with Dale Whitley approximately two (2) weeks prior to the purchase of the Trucks. It was at this time that the aforementioned representations were made by Mr. Whitley to Mr. Mathias. The same representations were made by Mr. Whitley to Mr. Mathias, approximately one (1) week later when Mr. Mathias returned to Navistar's sales facility to inspect the trucks again for purchase.

109. Specifically, Plaintiff Mark Lewis, LLC d/b/a Mark Lewis Trucking heard the aforementioned representations during conversations with Hill International representatives, during the months leading up to the purchase of the Trucks in 2011. Specifically, Mark Lewis, LLC d/b/a Mark Lewis Trucking's representative, Mark Lewis, met with and spoke to representatives of Hill International, including Mike McGowen, "Lenny", (Hill International's sales manager), Mike Barber, and Wes Housholder during the weeks leading up to the purchase of the Trucks. Hill representatives took Mr. Lewis to the Navistar test track in Columbus, Ohio, to show Mr. Lewis the truck in action. During this time, the Hill International representatives made the aforementioned representations, and assurances to Mr. Lewis that the MaxxForce engine technology was thoroughly tested, was a proven technology, had an excellent design, and that no problems existed with the engine.

110. Defendant Truck Sales and non-party Hill International did, in fact, make the Misrepresentations to Plaintiffs regarding the Trucks.

110. If Plaintiffs had known the true facts, Plaintiffs would not have purchased any Trucks from Defendants and non-party Hill International and would not have continued to permit Defendants to work on and attempt to repair these defective engines all the while keeping Plaintiffs' trucks out of service.

111. At the time Defendant Navistar made the above-described Misrepresentations, Defendant Navistar knew the Misrepresentations were false and/or made the Misrepresentations recklessly, as positive assertions, without knowledge of their truth.

112. Defendant Navistar made the above-described Misrepresentations with the intent that Plaintiffs rely on the Misrepresentations in making the decision to purchase the Trucks, and thus fraudulently induced Plaintiffs to purchase the Trucks.

113. Defendant Truck Sales made the above-described Misrepresentations with the intent that Plaintiffs rely on the Misrepresentations in making the decision to allow Truck Sales to service and repair the Trucks.

114. As a proximate result of Defendants' fraudulent Misrepresentations to Plaintiffs, Plaintiffs have suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

   a. Loss of profits;

   b. Downtime expenses and losses;

   c. Diminished resale value on the Trucks;

   d. Out-of-pocket repair expenses;

   e. Fuel expenses incurred in excess of the represented amounts;

   f. Towing expenses;

   g. Lodging expenses;

   h. Rental car expenses, including fuel for same;

   i. Unreimbursed driver downtime;

   j. Loss of revenue; and

k.      Other economic, financial, consequential, incidental and exemplary damages allowed by law or equity.

115.    Defendants fraud as described above was malicious, willful, and egregious. Defendants told one lie after another, in the hopes of achieving a sale, even though Defendants' own internal documents directly contradicted the representations they were making in order to lure Plaintiffs and other companies to purchase from them.

## FRAUD BY NONDISCLOSURE

116.    In addition or in the alternative, Plaintiffs bring a cause of action for fraud by nondisclosure against Defendants for withholding material information, otherwise unavailable to Plaintiffs, necessary to correct the false impression created by Defendants. Navistar had a duty to disclose material facts regarding the performance, reliability, and compliance with emission standards because its partial representations to Plaintiffs created a misleading impression on the part of Plaintiffs about the engines and trucks. There was a fiduciary or special relationship of trust and confidence between Plaintiff and Defendants, and as a result Defendants had a duty to disclose critical information. Plaintiffs placed special confidence and trust in the supposed integrity of Defendants, and Defendants grossly took advantage of the superiority or influence it had over Plaintiffs. Navistar, by its representations regarding the engines, created a misleading impression regarding the engines' testing, performance, and their reliability, when, in fact, Navistar knew the engines did not perform as Navistar had indicated, the engines were not as reliable as Navistar had said, and the engines were not fully tested, contrary to Navistar's representations. Having made representations that created misleading impressions about the trucks, Navistar had a duty to fully disclose material information about the trucks that would dispel the misleading impressions it had created, and Navistar knew that its failure to

disclose such information to Plaintiffs would render its prior statements misleading or untrue.

117.    Upon information and belief, Plaintiffs assert that Defendants knew that the MaxxForce engine with the EGR cooling system had inherent performance and reliability problems (the "Known Defects") at the time Plaintiffs purchased the Trucks.

118.    Upon information and belief, Plaintiffs assert that Defendant Navistar knew as early as 2008 that the MaxxForce engine with the EGR cooling system would never meet the 2010 EPA 0.2g NOx emissions regulations.

119.    Upon information and belief, Plaintiffs assert that Defendant Navistar knew as early as 2008 that the MaxxForce engine with the EGR cooling system had severe technical problems.

120.    Defendants concealed and/or failed and/or refused to disclose Known Defects to Plaintiffs.

121.    Upon information and belief, Defendants knew that Plaintiffs were ignorant of the Known Defects associated with the MaxxForce powered ProStars.

122.    Furthermore, Plaintiffs did not have an equal opportunity to discover the Known Defects until after purchasing and operating the Trucks.

123.    Upon information and belief, Defendants deliberately withheld the information about the Known Defects associated with the MaxxForce powered ProStars when they had a duty to disclose the information to Plaintiffs.

124.    By failing to disclose the Known Defects to Plaintiffs, Defendant Navistar induced Plaintiffs to purchase the Trucks.

125.    Plaintiffs, relying on the Misrepresentations made by Defendants, purchased the Trucks.

126.    By failing to disclose the Known Defects to Plaintiffs, Defendant Truck Sales induced Plaintiffs to continue servicing and repairing the Trucks.

127.    As a proximate result of Defendants' fraud by nondisclosure, Plaintiffs have suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

      a.    Loss of profits;

      b.    Downtime expenses and losses;

      c.    Diminished resale value on the Trucks;

      d.    Out-of-pocket repair expenses;

      e.    Fuel expenses incurred in excess of the represented amounts;

      f.    Towing expenses;

      g.    Lodging expenses;

      h.    Rental car expenses, including fuel for same;

      i.    Unreimbursed driver downtime;

      j.    Loss of revenue; and

      k.    Other economic, financial, consequential, incidental and exemplary damages allowed by law or equity.

## WARRANTY DISCLAIMERS

128.    Defendants' acts have rendered all exclusive or limited express warranties inapplicable because they have failed their essential purpose in that no amount of repair has been able to remedy the defects in Plaintiffs' Trucks.

129.    Plaintiffs are entitled to recover all actual and economic damages, including all consequential and incidental damages listed herein, from Defendants because all exclusive or limited express warranties have failed in their essential purpose.

## ATTORNEYS' FEES

130. As a result of Defendants' failures to comply with the terms of the Agreement, Plaintiffs were required to engage the undersigned attorneys to bring this action and has contracted to pay said attorneys a reasonable fee for such services rendered in connection herewith and for which Plaintiffs are entitled to recover in accordance with Ohio law. Further, as a result of Defendants' breach of an express warranty with Plaintiffs, Plaintiffs are similarly entitled to recover its attorneys' fees.

## INTEREST AND OTHER RELIEF

131. Plaintiffs pray for recovery of pre- and post-judgment interest on their damages from Defendants, and/or on any amount awarded in judgment against Defendants, at the maximum allowable, lawful rates, together with recovery of Plaintiffs' litigation costs and expenses from Defendants.

## CONDITIONS PRECEDENT

132. All conditions precedent to recovery by Plaintiffs have been complied with.

## JURY DEMAND

133. Plaintiffs request that this case be decided by a jury as allowed by Ohio law. The appropriate jury fee has been paid by Plaintiffs.

**WHEREFORE PREMISES CONSIDERED**, Plaintiffs pray that Defendants be cited to appear and answer this lawsuit and further pray that after final trial or hearing of this matter, the Court award Plaintiffs the following damages against Defendants:

(i) Actual damages;

(ii) Exemplary damages;

(iii) Loss of profits;

(iv)     Downtime expenses and losses;

(v)      Diminished resale value on the Trucks;

(vi)     Out-of-pocket repair expenses;

(vii)    Fuel expenses incurred in excess of the represented amounts;

(viii)   Towing expenses;

(ix)     Lodging expenses;

(x)      Rental car expenses, including fuel for same;

(xi)     Unreimbursed driver downtime;

(xii)    Loss of revenue;

(xiii)   Other economic, financial, consequential and incidental damages allowed by law or equity;

(xiv)    Pre and post-judgment interest;

(xv)     Costs of court;

(xvi)    Reasonable attorneys' fees; and

(xvii)   Such other and further relief to which Plaintiffs may show itself to be justly entitled at law or in equity.


Respectfully submitted,


**MILLER WEISBROD, LLP**

By: _____ for Warren Armstrong

**CLAY MILLER,** *pro hac vice*
cmiller@millerweisbrod.com
Texas State Bar No. 00791266
**WARREN M. ARMSTRONG,** *pro hac vice*
warmstrong@millerweisbrod.com
Texas State Bar No. 24044432

**ROBERT WOLF,** *pro hac vice*
Texas State Bar No. 24028234

11551 Forest Central Drive
Forest Central II, Suite 300
P. O. Box 821329 (75382)
Dallas, Texas 75243
(214) 987-0005
(214) 987-2545 (Facsimile)


and    *for Mark Kitrick*

**Kitrick, Lewis & Harris Co., L.P.A.**
**Mark Kitrick** (0000021)
**Sean Harris** (0072341)
515 East Main Street, Suite 515
Columbus, Ohio 43215-5398
(614) 224-7711
(614) 225-8985 (Facsimile)
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

This to certify pursuant to Ohio Rules of Civil Procedure that a true and correct copy of the foregoing document was forwarded to the following counsel of record as described below on this the 19th day of July, 2016.

| | | |
|---|---|---|
| Timothy C. Ammer | ELECTRONIC MAIL | ✓ |
| Jason A. Golden | CMRRR | |
| Lindsay M. Upton | FACSIMILE | |
| MONTGOMERY, RENNIE & JONSON | FIRST CLASS MAIL | |
| 36 East Seventh Street, Suite 2100 | | |
| Cincinnati, Ohio 45202 | | |
| | | |
| Paul Hervey | ELECTRONIC MAIL | ✓ |
| FITZPATRICK, ZIMMERMAN & ROSE | CMRRR | |
| CO., LPA | FACSIMILE | |
| P.O. Box 1014 | FIRST CLASS MAIL | |
| 140 Fair Ave. NW | | |
| New Philadelphia, Ohio 44663 | | |

Warren M. Armstrong